1  Matthew J. Moore
   moorem@howrey.com
2  Pamela S. Kane
   kanep@howrey.com
3  HOWREY LLP
   1299 Pennsylvania Avenue, N.W.
4  Washington, DC 20004
   Telephone: (202) 783-0800
5  Facsimile:  (202) 383-6610

6

7  Liaison Counsel for Defendants

8

9            IN THE UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
10

11

| | |
|---|---|
| 12  In Re: | ) Case No. CV 2:07-ml-01816-B-RGK |
| 13  Katz Interactive Call Processing Patent Litigation | ) (FFMx) |
| 14  This document relates to: | ) **DEFENDANTS' MEMORANDUM IN** |
| 15  | ) **SUPPORT OF MOTION FOR** |
| 16  ALL "B" TRACK ACTIONS (except CV 07-02254 RGK (FFMx)) | ) **SUMMARY JUDGMENT OF** |
| | ) **INVALIDITY OF RAKTL'S** |
| | ) **SELECTED CLAIMS UNDER** |
| | ) **SECTION 112** |
| 17  Case Nos. CV 07-2096 RGK (FFMx), CV | ) |
| 18  07-2099 RGK (FFMx), CV 07-2101 RGK (FFMx), CV 07-2134 RGK (FFMx), CV | ) Date:   To Be Determined |
| 19  07-2192 RGK (FFMx), CV 07-2196 RGK (FEMx), CV-07-2213 RGK (FFMx), CV | ) Time:  To Be Determined |
| 20  07-2220 RGK (FFMx), CV 07-2250 RGK (FFMx), CV 07-2257 RGK (FFMx), CV | ) Judge:  Hon. R. Gary Klausner |
| 21  07-2299 RGK (FFMx), CV 07-2322 RGK (FFMx), CV 07-2325 RGK (FFMx), CV | ) Ctrm:    Courtroom 850 |
| 22  07-2336 RGK (FFMx), CV 07-2339 RGK (FFMx), CV 07-2340 RGK (FFMx), CV | ) |
| 23  07-2360 RGK (FFMx), CV 07-3002 RGK (FFMx) | ) |

24

25

26

27

28

1
2
# TABLE OF CONTENTS
3

4  I.   INTRODUCTION ...................................................................................... 1

5  II.  INVALIDITY FOR LACK OF WRITTEN DESCRIPTION ................................ 1

6        A.   No Written Description In The Dual Call Mode Patents
7             Of A Plurality Of Formats......................................................... 3

8        B.   No Written Description In The Dual Call Mode Patents
             Of Unqualified Or Unverified Toll Free Calls............................ 4

9        C.   No Written Description In The Dual Call Mode Patents
10            Of Using DNIS To Identify A Format ........................................ 5

11       D.   No Written Description In The Dual Call Mode, Format
             Qualification, Or Lottery Patents Of Calling Or Called
12            Number Identification Signals "Automatically" Provided .......... 6

13       E.   No Written Description In The Format Qualification Or
             Conditional Interface Patents Of Operators Entering
14            Caller Data................................................................................ 9

15       F.   No Written Description In The Format Qualification
             Patents Of Providing Voice Operating Instructions To
16            "Specific Ones" Of The Individual Callers................................. 11

17       G.   No Written Description In The Format Qualification Or
             Lottery Patents Of Using DNIS To Control Processing
18            Of Formats................................................................................ 12

19       H.   No Written Description In The Lottery Patents Of A
             Generic "Ticket," "Card," "Format," And "Control
20            System" .................................................................................... 13

21       I.   No Written Description In The Lottery Patents Of A
             Unique Identification Number Providing An Indication
22            That It Has Reached A Predetermined Limit On Use................ 14

23       J.   No Written Description In The '150 Patent Of Testing
             The Selected Format "In Relation To Said Call Data
24            Signals" .................................................................................... 14

25       K.   No Written Description In The '415 Patent Of A
             "Format" Generally That Is Not Limited To A Game
26            Format ...................................................................................... 15

27       L.   No Written Description In The Format Qualification Or
             '965 Patents Of "A" File On "Said Individual Callers" .............. 16

28

HOWREY LLP

DM_US:21021836_1

M. No Written Description In The Format Qualification Patents Of Visually Displaying Customer Number Data, Data From A Data Bank Or Memory Accessed By ANI, Or Identification Data Entered By Callers ........................... 17

N. No Written Description In the Dual Call Mode Patents Of Testing ANI To Determine Whether To Qualify Callers For Communication With The System ........................ 19

O. No Written Description In The '965 Patent Of Computer Generated Acknowledgement Numbers ........................ 20

P. No Written Description In The Format Qualification Patents Of "Approval Signals" ........................ 20

Q. No Written Description In The Format Qualification Patents Of Central Memory Accessed By A Plurality Of Interface Switching Structures ........................ 21

R. No Written Description In The Dual Call Mode Patents of Cueing Callers By Synthesized Voice Signals ........................ 22

S. No Written Description In The Format Qualification Patents Of Including Key Numbers "In Packaging of Products" ........................ 24

T. No Written Description In The Format Qualification Patents Of Using Identification Data To Avoid Prompting Certain Callers With Previous Cues ........................ 25

III. INVALIDITY FOR CLAIM INDEFINITENESS ........................ 26

A. Claims Reciting Voice Signals To Actuate The Caller's Terminal Apparatus Are Indefinite ........................ 27

B. Generating Computer Acknowledgement Numbers To Identify The Transaction For "The System" In '965:31 Is Indefinite ........................ 28

C. Claims Reciting That Remote Terminals "May Comprise" A Conventional Telephone Instrument Are Indefinite ........................ 29

D. "Certain Individual Callers," "Said Individual Callers," And "At Least Certain Of Said Individual Callers" Render '965:35, 43, And 53 Indefinite ........................ 29

E. Receiving Signals Indicating A Customer Identification Number "Or" Receiving Responsive Signals Indicative Of Other Data Renders '965:61 And 66 Indefinite ........................ 30

F. "Means To Receive" Limitations In The '863 And '065 Patent Claims Fail To Link Structure To The Recited Function ........................ 31

HOWREY LLP

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF RAKTL'S SELECTED CLAIMS UNDER SECTION 112

DM_US:21021836_1

G.   "Said Additional Call Data Signals …" In '285:23 Is Indefinite ................................................................. 32

H.   System Claims Reciting A Method Step Of Callers Entering Data In The '707 And '893 Patents Are Indefinite ................................................................. 32

I.   "Processing/Computer Means" And "Means For Processing" In The Format Qualification Patents Are Indefinite For Failure To Link Structure Including Algorithm To The Recited Functions ........................ 33

J.   "Analysis Structure" In Claims Of The Format Qualification Patents Is Indefinite For Failure To Link Structure Including Algorithm To The Recited Functions ........................ 35

IV.   CONCLUSION ................................................................. 35

1

2

# **TABLE OF AUTHORITIES**

3 ## <u>CASES</u>

4 *Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech.*,
  2008 WL 819764 (Fed. Cir. Mar. 28, 2008) ................................ 27, 34

5 *Atmel Corp. v. Information Storage Devices, Inc.*,
6   198 F.3d 1374 (Fed. Cir. 1999) ................................ 26, 32, 34

7 *Bose Corp. v. JBL, Inc.*,
  274 F.3d 1354 (Fed. Cir. 2001) ................................ 26

8 *Cross Med. Prods., Inc. v. Medtronic Sofamore Danek, Inc.*,
9   424 F.3d 1293 (Fed. Cir. 2005) ................................ 33

10 *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
   412 F.3d 1291 (Fed. Cir. 2005) ................................ 26

11
12 *Eaton Corp. v. Rockwell Int'l Corp.*,
   323 F.3d 1332 (Fed. Cir. 2003) ................................ 22

13 *Festo Corp. v. Shoketsu Kinsoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002) ................................ 7

14
15 *Free Motion Fitness, Inc. v. Cybex Int'l*,
   423 F.3d 1343 (Fed. Cir. 2005) ................................ 8

16 *Hyatt v. Boone*,
   146 F.3d 1348 (Fed. Cir. 1998) ................................ 2, 4, 5

17
18 *In re Lew*,
   2007 WL 4201279 (Fed. Cir. 2007) ................................ 2, 13, 15

19 *Invitrogen Corp. v. Biocrest Mfg., L.P.*,
   424 F.3d 1374 (Fed. Cir. 2005) ................................ 26

20
21 *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
   430 F.3d 1377 (Fed. Cir. 2005) ................................ 33

22 *Lantech, Inc. v. Keip Machine Co.*,
   32 F.3d 542 (Fed. Cir. 1994) ................................ 11, 23

23
24 *Lockwood v. Am. Airlines, Inc.*,
   107 F.3d 1565 (Fed. Cir. 1997) ................................ 2

25 *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*,
   248 F.3d 1303 (Fed. Cir. 2001) ................................ 27

26
27 *Pause Tech. LLC v. TiVo Inc.*,
   419 F.3d 1326 (Fed. Cir. 2005) ................................ 7

28

*Personalized Media Communications, LLC v. International Trade Comm'n,*
    161 F.3d 696 (Fed. Cir. 1998) ............................................................. 26

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) ............................................................. 7

*Purdue Pharma L.P. v. Faulding, Inc.,*
    230 F.3d 1320 (Fed. Cir. 2000) ............................................................. 2

*Reiffin v. Microsoft Corp.,*
    214 F.3d 1342 (Fed. Cir. 2000) ............................................................. 3

*Security People, Inc. v. Medeco Security Locks, Inc.,*
    59 F. Supp. 2d 1040 (N.D. Cal. 1999) ................................................ 4

*Tandon Corp. v. U.S. Int'l Trade Comm'n,*
    831 F.2d 1017 (Fed. Cir. 1987) ............................................................. 7

*Tronzo v. Biomet, Inc.,*
    156 F.3d 1154 (Fed. Cir. 1998) ....................................................... 1, 5

*Turbocare Div. of Demag Delaval Turbomachinery Corp. v. General Electric Co.,*
    264 F.3d 1111 (Fed. Cir. 2001) ....................................................... 2, 3

*Vas-Cath, Inc. v. Mahurkar,*
    935 F.2d 1555 (Fed. Cir. 1991) ....................................................... 2, 3

*Verizon California, Inc. v. Ronald A. Katz Technology Licensing, L.P.,*
    Case No. 01-CV-09871 RGK (RCx) ................... 1, 3, 4, 5, 9, 10, 12, 21, 25, 31

*WMS Gaming Inc. v. Int'l Game Tech.,*
    184 F.3d 1339 (Fed. Cir. 1999) ............................................................. 27

## **STATUTES**

35 U.S.C. § 112 ................................................................... 1, 15, 29, 35

35 U.S.C. § 112, ¶ 1 ................................................................... 1

35 U.S.C. § 112, ¶ 2 ................................................................... 26

35 U.S.C. § 112, ¶ 6 ........................................... 26, 27, 31, 33, 34, 35

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY OF RAKTL'S SELECTED CLAIMS UNDER SECTION 112

DM_US:21021836_1

# I.   INTRODUCTION

Defendants move for summary judgment that a substantial number of the claims from the interactive call processing patents selected by plaintiff Ronald A. Katz Technology Licensing, L.P. ("RAKTL") are invalid for lack of written description or indefiniteness under 35 U.S.C. § 112. This memorandum is supported by a statement of uncontroverted facts ("SUF") and conclusions of law ("COL") and the declarations of Dr. Leonard J. Forys and Thomas A. Miller.

The selected claims at issue are from patents that are based on seven different specifications. SUF 1.1.41-1.1.51. From those specifications and others, RAKTL has flooded the Patent Office ("PTO") with thousands of claims over many years. Many of the defective claims at issue were submitted to the PTO years after the original patent applications were filed, some more than ten years later. Thus, it is not surprising that these later-filed claims lack written description support in the specifications. Many of the claims are invalid for indefiniteness, because they are insolubly ambiguous and their scope cannot be reasonably ascertained.

The record that the Court will need to review is manageable—primarily the patent specifications plus certain relevant portions of the prosecution histories. Moreover, this Court in *Verizon California, Inc. v. Ronald A. Katz Technology Licensing, L.P.*, Case No. 01-CV-09871 RGK (RCx), has already held a number of RAKTL patent claims invalid based on several of the written description defenses asserted below. Thus, this motion can dramatically reduce the number of patent claims at issue in this case.

# II.   INVALIDITY FOR LACK OF WRITTEN DESCRIPTION

A patent specification must "'contain a written description of the invention, and of the manner and process of making and using it....'" *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed. Cir. 1998) (quoting 35 U.S.C. § 112, ¶ 1). To satisfy this requirement, the specification must reasonably convey to one of skill in the art that the inventor possessed every limitation of the claimed invention at the time of filing. *Id.* A disclosure that merely renders the claimed invention obvious does not meet the written

1  description requirement; the disclosure must describe the claimed invention with all its

2  limitations.  *Id.*; *Turbocare Div. of Demag Delaval Turbomachinery Corp. v. General*

3  *Electric Co.*, 264 F.3d 1111, 1119 (Fed. Cir. 2001).  Statements in the specification that

4  "the invention" involves a particular element, including such statements in the summary

5  of the invention, are strong evidence that the inventor intended the invention to be

6  limited to embodiments containing that element.  *In re Lew*, 2007 WL 4201279 at *3

7  (Fed. Cir. 2007).

8  Although the meaning of terms, phrases, or diagrams in a specification is to be

9  explained from the vantage point of one skilled in the art, all the claim limitations must

10  appear in the specification.  *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed.

11  Cir. 1997).  A specification that does not unambiguously describe all limitations of a

12  claim does not meet the written description requirement.  The written description must

13  include all of the limitations in the claim, or it must be shown that any absent text is

14  ***necessarily*** comprehended in the description and would have been so understood at the

15  time the patent application was filed.  *Hyatt v. Boone*, 146 F.3d 1348, 1354-55 (Fed.

16  Cir. 1998); *Purdue Pharma L.P. v. Faulding, Inc.*, 230 F.3d 1320, 1323-24 (Fed. Cir.

17  2000) (one skilled in the art must immediately discern the limitation at issue).  "It is 'not

18  a question of whether one skilled in the art might be able to construct the patentee's

19  device from the teachings of the disclosure….  Rather, it is a question of whether the

20  application necessarily discloses that particular device.'"  *Hyatt*, 146 F.3d at 1353.

21  Thus, that the patent specification might possibly disclose the claimed invention is not

22  enough to meet the written description requirement.

23  The written description requirement is often implicated when claims not

24  presented in the patent application as originally filed are added later.  *Vas-Cath, Inc. v.*

25  *Mahurkar*, 935 F.2d 1555, 1560 (Fed. Cir. 1991).  These later claims must be supported

26  by the original disclosure.  "The purpose of [the written description requirement] is to

27  ensure that the scope of the right to exclude, as set forth in the claims, does not

28  overreach the scope of the inventor's contribution to the field of art as described in the

1  patent specification." *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000).

2      None of the claims that Defendants challenge as lacking an adequate written

3  description were included in the patent applications as originally filed.  All were added

4  later.  By adding those claims later, directed to combinations that are not supported by

5  the original disclosures, RAKTL is overreaching the scope of the contribution to the

6  field of art described in the patent specifications as filed.  *Reiffin*, 214 F.3d at 1345.

7      Although compliance with the written description requirement is a fact question,

8  *Vas-Cath*, 935 F.2d at 1563, it may be decided on summary judgment.  *See Turbocare,*

9  264 F.3d 1111 (affirming summary judgment of invalidity for lack of written

10  description).  RAKTL cannot point to explicit written descriptions in the relevant patent

11  specifications for the claim limitations at issue.  And because the specifications do not

12  ***necessarily*** disclose the claim limitations at issue, the written description requirement is

13  not satisfied.  There are no genuine issues of material fact.  Summary judgment of

14  invalidity for lack of written description should be granted.

15  **A.  No Written Description In The Dual Call Mode Patents Of A**
    **Plurality Of Formats**

16

17      The words "respective interface formats," "an interface format," and "another

18  interface format" (claim 7 of the '223 patent, hereafter '223:7); "distinct operating

19  process formats," "one of the operating process formats," and "a different one of the

20  operating process formats" ('223:58); and "plurality of interface formats," "first

21  interface format," and "second interface format" ('223:86) all mean more than one

22  interface or operating process format.  COL 2.2.1-2.2.4.  In *Verizon*, this Court held

23  claims reciting "a plurality of formats" in the Dual Call Mode patents (including

24  '223:107, which like claim 86 depends from claim 80) invalid for lack of written

25  description because the specification only describes a single format.  Miller Ex. 30

26  (Order re Verizon's Motion for Summary Judgment and Katz's Motion for Summary

27  Judgment, December 2, 2003 ("*Verizon* SJO") at 78-85); SUF 1.2.6.  The above claims

28  are invalid for the same reason.  *See Security People, Inc. v. Medeco Security Locks,*

1  *Inc.*, 59 F. Supp. 2d 1040, 1044-46 (N.D. Cal. 1999)(collateral estoppel applied to prior

2  summary judgment of noninfringement).

3      The Dual Call Mode specification describes a single format for a game or contest

4  that is accessible by three different call modes (800, 900, and area code). SUF 1.2.7. A

5  call mode is not the same as a format. SUF 1.2.8. Figure 2 of the specification depicts

6  three call modes but only a single format. SUF 1.2.9-1.2.13. Figure 2 is described as "a

7  flow diagram of ***an*** operating format of the system of FIG. 1." SUF 1.2.11. Figure 2 is

8  also described as depicting "the" format, not a plurality of formats. *Id*. In a recent

9  reexamination of the '734 Dual Call Mode patent, the PTO agreed, finding that "[t]he

10  '734 specification states that Fig. 2 is a ***single*** format" and "Fig. 2 shows the accessing

11  of the ***single*** 'interface format' accessed by different calling modes…." SUF 1.2.14.

12      None of the passages of the Dual Call Mode specification previously identified by

13  RAKTL's expert in the *Verizon* case[1] explicitly describes or even mentions a system

14  that operates a plurality of formats. SUF 1.2.15-1.2.18. Nor do any of them implicitly

15  or inherently describe this. SUF 1.2.16. Even RAKTL's expert admitted that other

16  interpretations of these passages are possible. *Id*. Because those specification passages

17  do not ***require*** or ***necessarily disclose*** "a plurality of formats," that claim limitation is

18  not implicitly or inherently described. *Hyatt*, 146 F.3d at 1353-54.

19      None of the claims included in the application as originally filed recited more

20  than one format. SUF 1.2.19. All of them recited "***an*** interface format." *Id*. Claims

21  reciting more than one format were not submitted until four years later. SUF 1.2.20.

22  Accordingly, '223:7, 58, and 86 are invalid because the Dual Call Mode patents only

23  describe a single format, not a plurality of formats. SUF 1.2.21.

24      **B.    No Written Description In The Dual Call Mode Patents Of Unqualified Or Unverified Toll Free Calls**

25

26      Selected '120:32 and 34 and '223:58 recite that the first and second response unit

27

---

28  [1] RAKTL's expert in *Verizon* and *Citibank*, Dr. Lucantoni, is also RAKTL's expert here, having submitted declarations in support of RAKTL's claim construction briefs.

1   means receive toll free calls, but that only "at least" toll free calls received by the first

2   response unit means are qualified or verified.  COL 2.2.5, 2.2.7.  Selected '223:86

3   recites 800 calls for first and second called numbers but verifying "at least" calls for one

4   of the two called numbers.  COL 2.2.8.  Selected '223:5 recites receiving calls in a toll

5   free call mode but not qualification of those calls.  COL 2.2.6.  Thus, these claims

6   include within their scope toll free calls that are **not** qualified or verified.  COL 2.2.9.

7          The specification, however, describes that **all** toll free calls are qualified or

8   verified and the importance of regulating toll free calls.  There is no description of

9   unqualified or unverified toll free calls.  SUF 1.2.29.  In *Verizon*, this Court held that

10  '734:81 and 94 and '223:107 (which like claim 86 at issue here depends from claim 80)

11  lack written description support because the Dual Call Mode patents only describe a

12  system in which **all** toll free calls are qualified.  *Verizon* SJO at 85-87; SUF 1.2.27.  The

13  claims at issue here are invalid for the same reason.  *See Tronzo*, 156 F.3d 1154 (claims

14  to generic "cup" not supported by description of cups with specific shapes).

15         The specification passages RAKTL cited in *Verizon* for written description

16  support do not describe toll free calls that are unqualified or unverified.  Even RAKTL's

17  expert only asserted that these passages "imply" or "can be taken to mean" that some

18  calls in the toll free call mode can be unregulated.  SUF 1.2.30-1.2.32.  *See Hyatt*, 146

19  F.3d at 1353-54 (no written description if specification does not require the limitation).

20         None of the originally filed claims recited unqualified or unverified toll free calls.

21  SUF 1.2.33.  Such claims were not submitted until four years later.  SUF 1.2.34.  The

22  claims are therefore invalid for lack of written description.  SUF 1.2.35.

23   **C.    No Written Description In The Dual Call Mode Patents Of Using DNIS To Identify A Format**

24

25         Selected '120:32 and 34 and '223:1, 58, and 86 recite using DNIS to identify or

26  select a format.  COL 2.2.10-2.2.14.  The Dual Call Mode patents, however, do not

27  provide written description support for this limitation.  The Court reached this

28  conclusion in *Verizon*, stating that the specification "does disclose that the

HOWREY LLP

-5-

DM_US21021836.v1

1   communication facility is capable of providing DNIS signals to the Katz system, but

2   does not clearly teach how such DNIS signals are used within the Katz system."[2]

3   *Verizon* SJO at 85; SUF 1.2.41.

4       DNIS is discussed at only two places in the specification, but those passages only

5   discuss that DNIS is provided to the system, not used to select or identify a format.

6   SUF 1.2.43.  The originally filed claims did not recite this (SUF 1.2.44), and no such

7   claims were submitted until four years later.  SUF 1.2.45.  Accordingly, the claims are

8   invalid for lack of written description.  SUF 1.2.46.

9       **D.    No Written Description In The Dual Call Mode, Format
            Qualification, Or Lottery Patents Of Calling Or Called Number
10           Identification Signals "Automatically" Provided**

11       Selected '120:32, 34, 57, 62, 63, and 67, '223:1, 3, and 58, '021:11, '863:5, 27,

12   31, 32, 42, 43, 49, 96, 98, and 99, '551:1, 19, 21, 33, and 34, '762:30, 32, and 67,

13   '547:11, 18, and 19, '360:13, 14, 18, 36, and 75, '707:201, '134:5, '065:13, and '703:35

14   and 72 all recite "automatically" to describe how called number identification signals or

15   data, such as "DNIS," and calling number identification signals or data, such as "ANI,"

16   are provided by the communication facility.  COL 2.2.15-2.2.38.  Because the Dual Call

17   Mode, Format Qualification, and Lottery patents describe DNIS or ANI being

18   "provided" by the communication facility, and not DNIS or ANI being "automatically

19   provided" by the communication facility, these patents do not suggest any definition for

20   "automatically" in this context.  COL 2.2.38.

21       While the claims at issue recite DNIS or ANI "automatically provided" by the

22   communication facility, other claims (e.g., '863:93 and '762:58) simply recite DNIS or

23   ANI "provided" by the communication facility.  COL 2.2.39.  Because some claims

24   recite "automatically provided" and others recite "provided" by the communication

25   facility, "there is presumed to be a difference in meaning and scope."  *Tandon Corp. v.*

26

27   _____
     [2] '223:58 and 86  are invalid for the additional reason that they recite identifying first
28   and second formats from a plurality of formats and, as discussed in Section A above, the
     specification does not describe a plurality of formats.

HOWREY LLP

-6-
MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY OF RAKTL'S SELECTED CLAIMS UNDER SECTION 112
DM_US21021836.v1

1  *U.S. Int'l Trade Comm'n,* 831 F.2d 1017, 1023 (Fed. Cir. 1987); *Pause Tech. LLC v.*

2  *TiVo Inc.*, 419 F.3d 1326, 1334 (Fed. Cir. 2005) (rejecting a construction as it "attaches

3  no significance to the word 'predetermine.'"); COL 2.2.40.

4      Moreover, the word "automatically" was added by amendment.  For example,

5  '734 application claim 38 was changed from "a communication facility which provides

6  digital DNIS signals" to "a communication facility which ***automatically*** provides digital

7  DNIS signals," and '863 application claim 56 was changed from "called number

8  identification signals (DNIS) to identify …" to "called number identification signals

9  (DNIS) ***automatically provided by said communication facility*** to identify …," without

10  explanation.  It is presumed that an unexplained amendment was made for a substantial

11  reason related to patentability, and estoppel applies to limit its scope.  *Id.*; *Festo Corp. v.*

12  *Shoketsu Kinsoku Kogyo Kabushiki Co.*, 535 U.S. 722, 739-40 (2002).  COL 2.2.41.

13      In view of the differences in claim language and the addition of "automatically"

14  by amendment, "automatically" in the context of automatically provided by the

15  communication facility must be given a meaning that does not render it superfluous.

16      In *Citibank*, RAKTL proposed that "automatically provided" means "provided by

17  a machine or without any human intervention."  COL 2.2.43.  That construction

18  improperly reads "automatically" out of the claims.  *Id.*  The designations "DNIS" and

19  "ANI" refer to signals that have always been provided by machine or without human

20  intervention.  COL 2.2.44.  DNIS and ANI have never been provided manually.

21  RAKTL's technical expert has previously admitted this.  *Id.*  '223:3 even recites "…

22  automatic number identification [ANI] signals associated with a calling terminal

23  automatically provided…."  COL 2.2.45.  Thus, "automatically provided" cannot mean

24  "by a machine or without human intervention," because if so construed, "automatically

25  provided" would mean the same thing as "provided."  *See Phillips v. AWH Corp.*, 415

26  F.3d 1303, 1314 (Fed. Cir. 2005) (the term "'steel baffles' … strongly implies that the

27  term 'baffles' does not inherently mean objects made of steel").  COL 2.2.46.

28      "Automatically" in the context of "automatically providing" DNIS and ANI

HOWREY LLP

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY OF RAKTL'S SELECTED CLAIMS UNDER SECTION 112

DM_US021021836.v1

1   means "without any external influence or control."  This is consistent with general use

2   dictionaries.  COL 2.2.42.  This is also consistent with RAKTL's construction of

3   "automatically" in *AT&T* and the definition offered in technical dictionaries, "self-

4   acting."  *Id*.  Defendants propose that "automatically" means "without any external

5   influence or control" (Webster's Dictionary) because it is more understandable to a jury

6   than "self-acting" from the technical dictionaries.

7       Defendants' construction is also consistent with the technology.  DNIS or ANI

8   may be provided to a call center in many ways, including out-of-band or in-band.

9   COL 2.2.47-2.2.51.  In-band signaling is not automatic because the communication

10  facility will not send DNIS or ANI until it first receives an acknowledgment from the

11  call center in response to an indication of an incoming call.  *Id*.  For example, if the call

12  center is handling too many calls, it will not "wink" back to the communication facility,

13  and DNIS and ANI will not be sent.  *Id.*  RAKTL's technical expert has previously

14  agreed with this.  COL 2.2.52.

15      Out-of-band signaling (e.g., ISDN), in contrast, is an automatic system; when the

16  call is to be established, the called and calling number digital data are automatically

17  provided by the communication facility to the call center as part of the call setup

18  message.  No "wink" is required.  Even if the ACD is not ready to receive the call, the

19  communication facility will provide ANI and DNIS.  COL 2.2.53.  RAKTL's technical

20  expert has also previously agreed with this.  COL 2.2.54.  Thus, out-of-band signaling

21  "automatically" provides the DNIS or ANI because it provides them regardless of any

22  external influence or control, as recited in the claims at issue.

23      Accordingly, the Court should adopt Defendants' construction (without external

24  influence or control) because it is consistent with the claim language, the language of

25  other claims, and the prosecution history.  COL 2.2.38-2.2.56; *Free Motion Fitness, Inc.*

26  *v. Cybex Int'l*, 423 F.3d 1343, 1348 (Fed. Cir. 2005) (courts "must ensure that any

27  reliance on dictionaries accords with the intrinsic evidence").

28      The Dual Call Mode and Format Qualification patent specifications only describe

the communication facility "providing" DNIS and ANI, not "automatically" providing DNIS and ANI.  SUF 1.2.70-1.2.81.  The systems proposed in the patents all require in-band signaling between the communication facility and the call center.  No out-of-band channels are available.  SUF 1.2.82.  For example, the '863 and '703 patents describe 50 lines accommodating 50 calls coming from the automatic call distributors to the processing system.  There is no allowance for an out-of-band channel.  The patent also indicates that there are 100 lines accommodating 100 calls between the communication facility and an ACD.  ('863 patent, col. 4, l. 12 to col. 5, l. 22; '703 patent, col. 5, l. 7 to col. 6, l. 20); *id.*  Again, there is no allowance for an out-of-band channel.  These lines are depicted in Figure 1 of the patents.  *Id.*  Likewise, the '120 patent describes a single connection for both audio and ANI ('120 patent, col. 7, ll. 1-11), which is in-band signaling.  *Id.*  Out-of-band signaling would require two connections.  *Id.*

Further, the '863 and '703 patents describe "DNIS capability" and "ANI capability" and those signals being "provided" but not "automatically" provided.  SUF 1.2.83, 1.2.85.  Likewise, the '120 patent discusses DNIS and ANI being "provided" but not "automatically" provided.  SUF 1.2.84, 1.2.85.  And none of the passages relied upon by RAKTL and its expert in *Verizon* describe DNIS and ANI being "automatically provided."  SUF 1.2.86-1.2.92.

Claims reciting "automatically" were not submitted until years after the original applications were filed.  SUF 1.2.93-1.2.98.  Thus, there is no written description in the Dual Call Mode, Format Qualification, and Lottery patents of calling or called number identification signals or data being "automatically" provided as claimed.  SUF 1.2.99.

### E.   No Written Description In The Format Qualification Or Conditional Interface Patents Of Operators Entering Caller Data

Selected '863:27, 31, 32, 42, 43, and 49, '551:1, 21, 33, and 34, '065:13, '360:13, 14, 18, 36, 75, 86, 106, 110, 114, and 119, '285:61, and '893:1, 2, 4, and 83 recite that live operators enter caller data.  COL 2.2.57-2.2.65.  That is, ***operators*** enter caller data through their terminals.  COL 2.2.66.  The claims further recite that the operator-entered

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY OF RAKTL'S SELECTED CLAIMS UNDER SECTION 112

DM_US21021836.v1

1  data is stored in the record structure ('863 claims), used to update data in memory ('551,

2  '065, and '360 claims), or processed or processed and stored ('285 and '893 claims).  *Id.*

3       The Format Qualification specification describes and depicts in Figure 1 an

4  operator-attended interface terminal IT to which callers can be transferred for direct

5  communication in certain circumstances.  SUF 1.2.111.  Similarly, the Conditional

6  Interface specification describes and depicts in Figure 1 operator-attended terminals

7  OS1-OSn to which callers can be transferred for communication with the operator.

8  SUF 1.2.112.  There is no description in either specification, however, of those

9  operators entering caller data.  SUF 1.2.111, 1.2.112.  Further, the specifications do not

10  describe operator-entered data being stored, used to update data, or processed and stored

11  as recited in the claims.  SUF 1.2.125; *see also id.*

12       By contrast, the '965 patent specification explicitly describes and depicts

13  operators entering caller data in memory.  SUF 1.2.113.  For example, the '965 patent

14  states that "the process controller 46 along with the lines 48 and 50 are linked to one of

15  the attended terminals AT1-ATn ***enabling an operator to speak directly with a caller***

16  ***and concurrently set data into the data cell register 34 through the controller 46***."  *Id.*

17  Figure 3 in the '965 patent depicts operators inputting caller data beginning with block

18  118, followed by block 128 (where the live interface with an operator is actuated), block

19  130, block 134, and ending with a complete record at block 108.  The flow diagrams in

20  Figure 3 of the Format Qualification patents and in Figure 2 of the Conditional Interface

21  patents, however, do not show live operators inputting caller data.  *Id.*

22       The passages of the Format Qualification specification previously relied upon by

23  RAKTL in *Verizon* do not provide written description support.  SUF 1.2.114-1.2.118.

24  There is also no inherent description in the Format Qualification and Conditional

25  Interface specifications that operators would enter caller data through their terminals as

26  required by the claims because the operators can simply write down data provided by

27  the caller on a piece of paper to be input later by others.  SUF 1.2.116-1.2.119.

28       Mr. Katz himself has admitted that caller data taken by an operator may not be

HOWREY LLP

1  entered by the operator but instead by another employee.  SUF 1.2.119.  And RAKTL's

2  expert previously testified that "completing a partially automated transaction" does *not*

3  inherently mean that the operator completes the transaction by entering data because

4  "[t]he operator can simply write down data for later entry."  *Id*.  Therefore, the passages

5  describing operators at the interface terminals do not *require* or *necessarily disclose* that

6  those operators enter caller data as recited in the claims.  *Id*.

7      Claims reciting operators entering caller data were not submitted until years after

8  the original applications were filed.  SUF 1.2.120-1.2.124.  Accordingly, there is no

9  written description in the Format Qualification or Conditional Interface patents of

10  operators entering caller data or that such operator-entered data is stored, used to update,

11  or processed and stored as recited in the claims.  SUF 1.2.125.

12  **F.  No Written Description In The Format Qualification Patents Of**
13  **Providing Voice Operating Instructions To "Specific Ones" Of**
    **The Individual Callers**
14

15      Selected '863:182 and 188-192 and '707: 69, 85, 86, and 92 recite that voice (or

16  vocal) operating instructions are provided to "specific ones" of the individual callers to

17  the system.  COL 2.2.67-2.2.69.  By contrast, other claims recite that vocal operating

18  instructions are provided to "*each* of said individual callers" (e.g., '863:11) or to "said

19  individual callers" ('707:96), not just to "specific ones" of said individual callers.  COL

20  2.2.70.  Given these differences in language, the words "specific ones" cannot be

21  ignored.  *See Lantech, Inc. v. Keip Machine Co.*, 32 F.3d 542, 546 (Fed. Cir. 1994) (all

22  limitations are meaningful).

23      "Specific" means "constituting or falling into a specific category."  COL 2.2.71.

24  Therefore, "specific ones of said individual callers" means that a group of callers is

25  determined from the individual callers to the system.  Also, the claims recite voice

26  operating instructions, not "specific" voice operating instructions.  *Id*.  This means that

27  only callers in the select group receive *any* voice operating instructions (although

28  different callers in the select group can receive different instructions), while other

-11-

1  callers receive no voice instructions at all.  *Id*.  This is consistent with RAKTL's

2  proposed construction in *AT&T*, "individual callers chosen from a group."  *Id*.

3       The Format Qualification specification, however, describes that voice operating

4  instructions are provided to ***all*** individual callers to the system.  This is depicted in

5  Figure 3 and the accompanying text.  Although different callers can receive different

6  instructions, no matter what path a caller takes through this flow diagram, the voice

7  generator is cued to provide operating instructions to the caller (blocks 42, 46, and 56).

8  SUF 1.2.132.  There is no description in the specification, including the passages

9  previously relied upon by RAKTL in *Verizon*, of voice instructions being provided to

10  only some of the individual callers.  SUF 1.2.132-1.2.134.

11       Nor was this recitation included in the claims as originally filed, and no such

12  claims were submitted until eight years later.  SUF 1.2.135-1.2.136.  Accordingly, there

13  is no written description of providing voice operating instructions to "specific ones" of

14  the individual callers as recited in the claims.  SUF 1.2.137.

15  **G.  No Written Description In The Format Qualification Or Lottery**
16        **Patents Of Using DNIS To Control Processing Of Formats**

17       Selected '551:19 and '135:1 and 9 recite using DNIS to control processing of the

18  format.  COL 2.2.72, 2.2.73.  '135:1 and 9 separately recite identifying a format using

19  DNIS.  Thus, "controlling" a format means something different from identifying a

20  format.  COL 2.2.74.  "Controlling" means directing the operations of the format after

21  the format has been selected.  COL 2.2.75.  This is consistent with RAKTL's

22  construction of "controlling" in the *AT&T* case in the context of the operations of an

23  interface – "regulate operations of an interface."  *Id*.

24       The Lottery patents describe using DNIS to "indicate" the format but not to

25  control the operation of the format.  SUF 1.2.142.  The Format Qualification

26  specification also does not describe using DNIS to control the operation of a format.

27  SUF 1.2.143.  RAKTL's expert in *Verizon* relied on a passage in the specification

28  describing "geographic (or other) classification" as providing a description of DNIS

controlling the format.  This passage, however, does not describe how this would be accomplished.  SUF 1.2.145.  The other passages relied upon by RAKTL in *Verizon* also do not describe using DNIS to control the format.  SUF 1.2.144, 1.2.145.

The originally filed claims in the applications leading to the '551 and '135 patents did not recite using DNIS to control the format.  SUF 1.2.146, 1.2.148.  Such claims were not filed until over nine and six years later, respectively.  SUF 1.2.147, 1.2.149.  Thus, there is no written description in the Format Qualification or Lottery patents of using DNIS to control processing of the format as recited in the claims.  SUF 1.2.150.

## H.   No Written Description In The Lottery Patents Of A Generic "Ticket," "Card," "Format," And "Control System"

Selected '156:11 recites a "ticket or card" and '135:1 and 9 and 703:35 recite a "ticket."  All recite a "format."  COL 2.2.76-2.2.78.  The Court has interpreted "ticket," "card," and "format" generically to cover any ticket, card, or format, not just lottery tickets, cards, and formats.  COL 2.2.79.  Similarly, selected '703:72 recites a generic "telephonic-interface control system."  COL 2.2.80, 2.2.81.

The specification does not describe any kind of ticket, card, format, or system other than for a lottery.  SUF 1.2.159-1.2.160.  The patent title is "Telephonic-Interface Lottery System."  SUF 1.2.158.  The Summary of the Invention states that "the present invention comprises a telephonic-interface lottery system" that uses a "scratch-off lottery ticket."  SUF 1.2.159.  *In Re Lew*, 2007 WL 4201279 at *3 (description of "the invention" is strong evidence limiting the invention).  The only embodiment described ('156 patent, col. 3-13) is a lottery system using lottery tickets.  SUF 1.2.160.  FIG. 2 describes "a scratch-off lottery ticket for use in the system of FIG. 1."  *Id*.

The originally filed claims only recited "lottery" tickets and formats. SUF 1.2.161.  Claims reciting "cards," "tickets," "formats," and "systems" generally were not submitted until much later.  SUF 1.2.162-1.2.165.  Further, during prosecution of one of the Lottery patent applications, the PTO held that the disclosure of lottery tickets in the specification did not support claims to other kinds of tickets or cards.  SUF

1.2.166.  Thus, there is no written description in the Lottery patents of a "card," "ticket," "format," or "system" generally as claimed.  SUF 1.2.167.

**I.    No Written Description In The Lottery Patents Of A Unique Identification Number Providing An Indication That It Has Reached A Predetermined Limit On Use**

Selected '135:1 and 9 recite identification indicia on a substrate of a ticket indicating a unique identification number that provides an indication that the unique identification number has reached a predetermined limit on use.  COL 2.2.82.  This means that the unique identification number on the substrate must itself indicate that the predetermined limit on use has been reached.  COL 2.2.83.

While there are a number of references in the specification to the "unique identification number" (SUF 1.2.170), the only description of the unique identification number that relates to a predetermined limit on use is the description that "the number is treated as a consumable key, entitled for example, to a single use for participation."  SUF 1.2.171.  The specification, however, does not describe the unique identification number itself having an indication of when the predetermined limit on use has been reached as required by the claims, because the unique identification number on the card cannot be incremented or decremented; it does not change.  *Id.*

Claims reciting a unique identification number that provides an indication that a predetermined limit on use has been reached were not submitted until almost six years after the original application was filed.  SUF 1.2.172, 1.2.173.  Accordingly, the claims are invalid for lack of written description.  SUF 1.2.174.

**J.    No Written Description In The '150 Patent Of Testing The Selected Format "In Relation To Said Call Data Signals"**

Selected '150:10 and 11 recite testing the selected format "in relation to said call data signals."  COL 2.2.84.  "Said call data signals" refers back to "call data signals, as to indicate called and calling numbers" in the preamble.  The claims also recite a step of selecting a format before the testing step.  COL 2.2.85.  Thus, the claims require that the

HOWREY LLP

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY OF RAKTL'S SELECTED CLAIMS UNDER SECTION 112

DM_US21021836.v1

1  selected format is tested in relation to both called **and** calling number signals (i.e., "said
2  call data signals") after the format is selected.  *Id.*

3      The specification describes an initial test operation "in which the calling number
4  is checked for validity against, for example, a negative list of calling numbers."
5  SUF 1.2.178.  It further describes that after initial qualification, conditions involving
6  time, history, and demographics may be tested in some cases using the calling number
7  or ANI.  SUF 1.2.179.  None of the foregoing tests, however, involve testing DNIS or
8  testing the selected format in relation to DNIS and ANI.  SUF 1.2.177, 1.2.179.

9      None of the originally filed claims recited a step of testing the format in relation
10 to "said call data signals" to conditionally interface the caller to the selected format.
11 SUF 1.2.180.  In fact, application claim 11 (which became 150:10) was amended to add
12 the step of "testing the selected format in relation to said call data signals" in response
13 to a § 112 indefiniteness rejection.  SUF 1.2.181, 1.2.182.  Accordingly, there is no
14 written description in the '150 patent of testing the selected format in relation to "said
15 call data signals" as recited in the claims.  SUF 1.2.183.

16   **K.    No Written Description In The '415 Patent Of A "Format"**
17         **Generally That Is Not Limited To A Game Format**

18      Selected '415:2 recites "formats" generally, without limiting the type of format to
19 a game format.  COL 2.2.86.  The Court has construed "format" in '415:29 to mean
20 formats generally.  COL 2.2.87.  Indeed, RAKTL must assert a generic construction of
21 "formats" because Defendants' accused call center services do not involve games.

22      The specification of the '415 patent, however, only describes **game** formats.  The
23 title of the patent is "Telephonic-Interface Game Control System."  SUF 1.2.186.  The
24 abstract describes a control system "to accommodate game formats."  SUF 1.2.189.  The
25 "Prior Art Considerations" section states that a "need exists for expanding operating
26 capabilities, as to accommodate various **game** formats."  SUF 1.2.187.  The "Invention
27 Summary" states that "the present invention" is a system and related processes for
28 "game formats or programs."  SUF 1.2.188.  *See In Re Lew*, 2007 WL 4201279 at *3

1  (description of "the invention" is strong evidence limiting the invention).  Moreover, the
2  only illustrative embodiment described is a game format.  SUF 1.2.190.

3      Claims reciting formats generally were not submitted until after the original
4  application was filed.  SUF 1.2.191-1.2.192.  Thus, there is no written description in the
5  '415 patent of formats generally as claimed.  SUF 1.2.193.

6  
7      **L.**    **No Written Description In The Format Qualification Or '965
    Patents Of "A" File On "Said Individual Callers"**

8      Selected '309:46 and 51 and '707:24 recite "a" file relating to "said individual
9  callers."  COL 2.2.88, 2.2.89.  "Said individual callers" refers back to "individual
10  callers" in the preamble, which means all of the callers to the system.  Because the
11  claim uses the word "comprising" in the preamble, "a" file can mean one or more files.
12  Therefore, "a file" on "said individual callers" encompasses updating data for ***all*** of the
13  callers to the system in a ***single*** file.  COL 2.2.90.

14      Selected '965:35, 43, and 53 recite comparing caller identification data received
15  against "a" file on "said individual callers" and then using the identification data to
16  access the file to locate other data associated with the caller.  COL 2.2.91.  "Said
17  individual callers" in the comparing step has no antecedent basis, but it appears to
18  encompass all of the "said individual callers" that received voice prompts in the prior
19  "prompting" step.  Therefore, "a file" on "said individual callers" encompasses data in a
20  single file on all of the callers that received prompts.  COL 2.2.92.

21      This language in the above claims is in contrast to other claim language
22  specifically reciting a file for ***each*** caller, e.g., "to access a file for said individual
23  caller" ('965:31).  COL 2.2.93.

24      The specifications, however, do not describe individual files storing data on all
25  callers.  There are only a few references to "file" in the Format Qualification
26  specification.  One states that "the customer has a file customer number" that is stored
27  in the block format register 104.  The other states that designation unit 96 "updates the
28  file as to current use or dollar value remaining for the caller's use."  Both references

describe a separate file for each caller, not a single file for all callers.  SUF 1.2.200.  The specification also describes a cell C1 depicted in Figure 2 for storing information on an individual caller, further demonstrating that the specification describes a file for each caller, not a file for all callers.  SUF 1.2.201.

There are only two references to "file" in the '965 patent, one stating that the audio response units "access a file on the caller" and another describing "using a customer's credit card number to access the file."  SUF 1.2.202.  The first reference clearly states that there is "a file" for each caller, and the second suggests this.  *Id.*

RAKTL did not include claims reciting "a" file relating to "said individual callers" until years after the original applications were filed.  SUF 1.2.203-1.2.206. Thus, there is no written description of this claim limitation.  SUF 1.2.207.

**M.  No Written Description In The Format Qualification Patents Of Visually Displaying Customer Number Data, Data From A Data Bank Or Memory Accessed By ANI, Or Identification Data Entered By Callers**

Selected '360:13, 14, 18, 36, 86, 106, 110, 114, and 119, '065:13, and '551:21, 33, and 34 recite "visually displaying the customer number data" or a portion thereof. COL 2.2.94-2.2.97.  Determining that "customer number" does not refer generally to various types of identifications, the Court has construed "customer number" to mean a number assigned to a customer by a vendor or merchant or recognized by a vendor or merchant for the purpose of identification of the customer, and which is distinct from a credit card number.  COL 2.2.98.

Selected '707:201 recites "an attended terminal which displays data obtained from a data bank accessed by said calling number identification data."  COL 2.2.103. "Said calling number identification data" refers back to the term in the interface structure element, which is ANI because it is provided from the communication facility. COL 2.2.104.  Therefore, these claims require that all or part of the customer number data or the data from a data bank accessed by ANI be visually displayed.  *Id.*

1    Similarly, selected '551:1 recites "automatically receiving caller telephone

2  number data from said telephone facility," "said caller telephone number data being

3  stored in said memory such that said computer means in accordance with said select

4  operating format is capable of accessing said customer data on a selected customer

5  which has a telephone number corresponding to said caller telephone number data

6  automatically provided from said telephone facility" and "visually displaying said

7  customer data."  COL 2.2.101.  Thus, "visually displaying said customer data" requires

8  displaying data accessed from a memory using ANI.  COL 2.2.102.

9    Selected '360:75 recites "receiving caller identification data entered by the

10  callers" and "said computer visually displaying said identification data on a selected

11  caller."  COL 2.2.99.  "Said identification data" refers to "caller identification data

12  entered by the callers."  This claim thus requires that identification data entered by the

13  callers is visually displayed.  COL 2.2.100.

14    The specification does not describe visually displaying any of the foregoing types

15  of data.  SUF 1.2.220.  The specification describes a command CRT computer display

16  terminal CT (Fig. 1).  SUF 1.2.221.  The specification states that the auctioneer is given

17  certain information regarding the status of the bidding process at terminal CT in the

18  auction format and that "bulk data" is supplied to terminal CT in the polling format but

19  does not describe displaying customer number data, identification data entered by callers,

20  or data from a data bank or memory as claimed.  SUF 1.2.221, 1.2.222.  RAKTL has

21  previously relied on a passage stating that "the status of the analysis can be televised by

22  selecting a camera focused on the interface terminal IT" in the dramatic broadcast

23  program format as support for "visually displaying customer number data."  SUF

24  1.2.223.  This does not describe displaying customer number data, identification data

25  entered by callers, or data from a data bank or memory as claimed.  *Id*.

26    Claims reciting visually displaying these types of data were not added until years

27  after the original application was filed.  SUF 1.2.224-1.2.227.  Accordingly, there is no

28  written description of visually displaying the data recited in the claims.  SUF 1.2.228.

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY OF RAKTL'S SELECTED CLAIMS UNDER SECTION 112

DM_US21021836.v1

**N.     No Written Description In the Dual Call Mode Patents Of Testing
ANI To Determine Whether To Qualify Callers For
Communication With The System**

Selected '120:67 recites "testing, to determine whether to qualify the callers for
voice-digital communication with the system, the identification signals that indicate the
telephone numbers."  COL 2.2.105.  The previous "receiving" step recites that those
identification signals tested for qualification are ANI signals, because they are provided
by the telephone communication facility.  COL 2.2.106.  The claim is not limited to a
particular call mode, and because dependent claim 71 recites "800" and "900" calls,
claim 67 necessarily encompasses those call modes.  COL 2.2.107.

The specification, however, only describes testing ANI signals for qualification in
the area code (ACN) call mode, not in the "800" or "900" call modes.  For ACN calls,
the specification describes a coincidence test between an approved number sequence of
three digits and the last three digits of the calling number (ANI) to determine whether
the caller should have access to the system (Figure 2, block 64).  SUF 1.2.232.  By
contrast, for "800" calls, only an identification number input by the caller, not ANI, is
tested to verify or qualify callers (Figure 2, block 56).  SUF 1.2.233.  There is no
description of testing "900" calls at all as shown in Figure 2 and the accompanying
description.  SUF 1.2.234.  Thus, even though claim 67 encompasses "800" and "900"
calls, there is no description of testing ANI to determine whether to qualify "800" and
"900" callers for communication with the system.  SUF 1.2.235.

Claims reciting testing ANI to determine whether to qualify callers for
communication with the system were not submitted until over five years after the
original patent application was filed.  SUF 1.2.236, 1.2.237.  Accordingly, there is no
written description of testing ANI to determine whether to qualify callers for
communication with the system as recited in '120:67.  SUF 1.2.238.

HOWREY LLP

### O.     No Written Description In The '965 Patent Of Computer Generated Acknowledgement Numbers

Selected '965:31 recites "generating computer acknowledgement numbers," and selected '956:35, 43, and 53 recite "computer generated acknowledgement numbers." COL 2.2.108, 2.2.109.  This means that a computer generates an acknowledgement number.  The Court has already construed "acknowledgement number."  COL 2.2.110.

The '965 patent does not describe acknowledgement numbers being computer generated.  SUF 1.2.242.  The specification only describes acknowledgement numbers being "revealed," "indicated," "provided," "communicated," "vocalized," "confirmed," and "identified," not computer generated.  SUF 1.2.243.  Moreover, the acknowledgement numbers discussed in the specification are not inherently or necessarily computer generated, because they could be prepared manually, not by a computer.  SUF 1.2.244.  By contrast, the Format Qualification patents describe that the processors create acknowledgement digits for the call; no such description is included in the '965 patent.  SUF 1.2.242, 1.2.243.

The first time claims were submitted reciting "generating computer acknowledgement numbers" or "computer generated acknowledgement numbers" was not until ten years after the original patent application was filed.  SUF 1.2.245, 1.2.246.  Accordingly, there is no written description in the '965 patent of acknowledgement numbers generated by a computer as recited in the claims.  SUF 1.2.247.

### P.     No Written Description In The Format Qualification Patents Of "Approval Signals"

Selected '707:69, 85, 86, and 92 and '863:1, 2, 5, 182, and 188-192 recite "providing approval signals for qualified individual callers" in the qualifying step and "processing at least certain of said answer data responsive to said approval signals." COL 2.2.111.  An "approval signal" is generated by the system when a caller is qualified for access to the operations of the interface.  COL 2.2.112.

The Format Qualification specification mentions caller approval, but does not

1  mention approval *signals*.  SUF 1.2.251.  By contrast, the earlier '968 patent

2  specification does describe approval signals:  "Essentially, the look-up table 122 is

3  indexed and addressed by the identification numbers of callers and responds with

4  *approval signals* for the callers, if appropriate."  *Id*.  Although the '968 patent is from

5  an earlier application in the chain leading to the Format Qualification patents, the

6  above-quoted passage was not included in the Format Qualification specification.  *Id*.

7      Claims were not submitted reciting "providing approval signals for qualified

8  individual callers" until years after the original patent application was filed.  SUF

9  1.2.252, 1.2.253.  Accordingly, there is no written description in the Format

10  Qualification patents of approval signals as recited in the claims.  SUF 1.2.254.

11
12  **Q.    No Written Description In The Format Qualification Patents Of
       Central Memory Accessed By A Plurality Of Interface Switching
13       Structures**

14      Selected '551:21, 33, and 34 recite "a plurality of interface switching structures

15  located at different geographic locations" and "processing means connected to the

16  plurality of interface switching structures for receiving customer number data entered by

17  a caller and for storing the customer number data in a central memory accessed by said

18  plurality of interface switching structures."  COL 2.2.113.  The Court interpreted

19  "placed at spaced apart remote geographic locations" in '134:5 to mean that the

20  interface units "are not in the same place or location, and requires more than mere

21  physical separation at the same location" in *Verizon California, Inc. v. Ronald A. Katz*

22  *Technology Licensing, L.P.*, 326 F. Supp.2d 1060, 1106 (C.D. Cal. 2003).  "Located at

23  different geographic locations" should be interpreted in the same way.  COL 2.2.114.

24  Thus, the claims require the customer number data in the central memory to be accessed

25  by interface switching structures not in the same place or location.  *Id*.

26      The Format Qualification specification does not describe a central memory

27  accessed by a plurality of interface switching structures that are not in the same place or

28  location.  In *Citibank*, RAKTL asserted that processors PR1-PRn have a centrally

HOWREY LLP

DM_US21021836.v1

1  accessible memory.  Processors PR1-PRn do not contain a central memory accessed by

2  a plurality of interface switching structures located at different geographic locations.

3  The specification depicts in Figures 1 and 4 that each processor PR1-PRn contains its

4  own dedicated memory 98 (Figure 4).  Because processors PR1-PRn (with their

5  memories 1-n) are connected to a single automatic call distributor (AC1), a single

6  interface 20, and a single switch 21, there is no description of a plurality of interface

7  switching structures at different geographic locations that can access a central memory.

8  In fact, Figures 1 and 4 describe many memories connected to a single interface, not a

9  central memory connected to multiple interfaces.  SUF 1.2.257-1.2.261.

10  Also in *Citibank*, RAKTL asserted that the embodiment depicted in Figure 9

11  provides written description support for the claim limitations at issue.  RAKTL relied

12  upon the statement that "data accumulated in the cells may be downloaded as to a

13  central processing station."  SUF 1.2.262.  This passage, however, does not describe a

14  central memory accessed by interface switching structures located at different

15  geographic locations, because there is no central memory described in the specification

16  in connection with the embodiment of Figure 9.  *Id*.

17  Claims reciting interface switching structures located at different geographic

18  locations that can access a central memory were not added until years after the original

19  application was filed.  SUF 1.2.263, 1.2.264.  Thus, there is no written description of

20  this claim limitation in '551:21, 33, and 34.  SUF 1.2.265.

21  **R.    No Written Description In The Dual Call Mode Patents of Cueing**
22  **Callers By Synthesized Voice Signals**

23  Selected '223:5 recites "individually cueing said callers" to prompt them to

24  provide digital signals in the means for individually cueing limitation.  COL 2.2.115,

25  2.2.116.  This limitation has its antecedent basis in "callers are cued by synthesized

26  voice signals" in the preamble, which is therefore a claim limitation.  *See Eaton Corp. v.*

27  *Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the

28  body of the claim rely upon and derive antecedent basis from the preamble, then the

1   preamble may act as a necessary component of the claimed invention."). COL 2.2.117.

2   The Court has already interpreted "cue" to mean a question or prompt which is given to

3   a caller.  COL 2.2.121.  The claim specifically recites that callers are cued by

4   "synthesized" voice signals, not simply voice signals.  Other claims of the patent, such

5   as claim 3, recite that callers are cued by "voice signals."  *Id.*  Therefore, "synthesized"

6   in claim 5 requires a specific type of voice signal.  *See Lantech,* 32 F.3d at 546 (all

7   limitations are meaningful).

8       The state of the art, as reflected in articles cited during prosecution of the Dual

9   Call Mode patents, distinguishes between synthesized voice messages and prerecorded

10  voice messages.  For example, Yoshizawa, et al. ('120 patent prosecution) states that

11  "[m]ethods of voice output are divided into two large categories:  editing of prerecorded

12  speech, and synthesizing of voice.  In the former method, voices representing words and

13  phrases are recorded on a magnetic drum or optical drum and these are edited as

14  necessary at the instruction of a computer.…  In the synthesizing method, various

15  control data are combined to produce voices mechanically."  COL 2.2.118.  Flanagan,

16  et al. ('223 patent prosecution) discussed "well known techniques for prerecording

17  natural voice utterances and storing these messages in a computer memory" and "a

18  speech synthesis approach" where "the simple technique of prerecorded natural speech

19  is ruled out."  COL 2.2.119.  In view of this state of the art, one of ordinary skill in the

20  art would understand cueing callers with synthesized voice signals to mean that the cues

21  are a collection of audio signals artificially generated by a computer without using

22  recorded human speech.  COL 2.2.120.

23      The specification, however, does not describe "synthesized" voice signals.  For

24  example, the specification describes giving the caller a simulated voice question from

25  one of the audio response units.  SUF 1.2.271.  All of the cueing examples in the

26  specification could readily have been done using prerecorded human voice.  None of

27  them required the use of synthetic voice.  *Id.*  Further, the specification does not

28  describe the "complex control system" (Yoshizawa article) that is required for a

HOWREY LLP

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY OF RAKTL'S SELECTED CLAIMS UNDER SECTION 112

DM_US21021836.v1

1  synthesized voice signal system.  The specification only describes audio response units,
2  which typically would be capable of only providing prerecorded cues.  SUF 1.2.272.

3       Claims that recited cueing callers by synthesized voice signals were not added
4  until almost two years after the original patent application was filed.  SUF 1.2.273,
5  1.2.274.  Therefore, there is no written description of cueing callers by synthesized
6  voice signals as recited in '223:5.  SUF 1.2.275.

7       **S.**     **No Written Description In The Format Qualification Patents Of**
8                 **Including Key Numbers "In Packaging of Products"**

9       Selected '863:182 recites key numbers that "are included in packaging of
10  products."  COL 2.2.122.  The patent includes other claims (e.g., '863:188) that recite
11  "providing products carrying key numbers," but not that the key numbers are included
12  in "packaging" of products.  COL 2.2.123.  Claim 191 depends from claim 188 and, like
13  claim 182, specifies that the key numbers are "provid[ed] in packaging of products."
14  Because of this difference in claim language, a person of ordinary skill in the art would
15  understand them to have different meanings.  Claim 182 requires that the key numbers
16  be in the packaging of the product, not merely carried on the product.  *Id.*

17       The specification describes a key number being carried on the product:  "A key to
18  participation in the game show may involve the purchase of a particular product.  For
19  example, a person desiring to participate may purchase *a product which carries a*
20  *concealed key number*."  SUF 1.2.278.  The specification does not describe that the
21  concealed key number is included *in packaging* of the product.  *Id.*

22       Claims reciting key numbers included in packaging of products were not
23  submitted until eight years after the original application was filed. SUF 1.2.279, 1.2.280.
24  Thus, there is no written description in the Format Qualification specification of key
25  numbers being included in packaging of products as claimed.  SUF 1.2.281.

26
27
28

**HOWREY LLP**

DM_US21021836.v1

**T.     No Written Description In The Format Qualification Patents Of Using Identification Data To Avoid Prompting Certain Callers With Previous Cues**

Selected '134:5 requires a central processor that, among other things, performs two functions: (1) "testing the at least certain identification data to control access to at least certain operations of said selected format" and (2) "utilizing the certain identification data to avoid prompting certain callers with a certain previously provided cue or cues." COL 2.2.124. Based on the Court's construction of similar language in '120:67, the "utilizing …" phrase in '134:5 means using the identification data to prevent callers from receiving one or more specific prompts that the callers previously received. COL 2.2.125.

The '134 patent includes a description of the first function (i.e., qualification). For example, the specification describes the caller using buttons on the telephone to input her telephone number and then "testing the telephone number as valid or entitled." SUF 1.2.284. There is no description of the second function (i.e., cue suppression). SUF 1.2.285. The passages previously relied upon by RAKTL in *Verizon* do not describe this limitation. SUF 1.2.286-1.2.289.

None of the originally filed claims included this limitation. SUF 1.2.290. It was not included until eight years later, when the amended language was described as "subject matter deemed to be previously allowable by the examiner" and reference was made to the same type of language in the '120 patent. SUF 1.2.291. But the '120 patent is a Dual Call Mode patent, which has a different specification from that of the '134 Format Qualification patent. The '120 patent *does* describe using identification data to avoid prompting callers with certain cues previously provided to them, for example:

The address numbers from the generator 40 are also supplied to a coincident detector 42 that also receives the address numerals of questions previously presented to a specific caller from a record 44. Thus, before a question is presented to a caller, the number of the calling terminal is

HOWREY LLP

DM_US21021836.v1

1    checked to assure that the same question has not previously been posed to

2    a caller at that terminal.

3  This description is not included in the '134 patent specification.  SUF 1.2.292.

4    Thus, there is no written description in the Format Qualification specification of

5  using identification data to avoid prompting callers with certain previously provided

6  cues as recited in '134:5.  SUF 1.2.293.

7  **III.   INVALIDITY FOR CLAIM INDEFINITENESS**

8    35 U.S.C. § 112, ¶ 2 requires that the specification conclude with one or more

9  claims "particularly pointing out and distinctly claiming the subject matter which the

10  applicant regards as his invention."  Claims that fail to meet this requirement are invalid

11  for indefiniteness.  *Personalized Media Communications, LLC v. International Trade*

12  *Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998).  The issue is one of law for the court.  *Id.*

13    The issue depends on whether those skilled in the art would understand the claim

14  when read in light of the specification.  *Atmel Corp. v. Information Storage Devices,*

15  *Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999).  A claim is indefinite if it "is insolubly

16  ambiguous, and no narrowing construction can be adopted."  *Invitrogen Corp. v.*

17  *Biocrest Mfg., L.P.*, 424 F.3d 1374, 1383 (Fed. Cir. 2005).  If a claim limitation lacks

18  proper antecedent basis and the scope of the claim cannot be reasonably ascertained, the

19  claim is indefinite.  *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001).

20    A claim reciting a means-plus function limitation is indefinite if the specification

21  fails to clearly link any structure to the function recited in the means-plus-function

22  limitation.  *Atmel*, 198 F.3d at 1380.  "A structure disclosed in the specification qualifies

23  as 'corresponding' structure only if the specification or prosecution history ***clearly links***

24  or associates that structure to the function recited in the claim."  *Default Proof Credit*

25  *Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005)

26  (emphasis added).  A patentee's obligation to clearly link structure to the recited

27  function is the *quid pro quo* for the convenience of employing § 112, ¶ 6.  *Id.*  That a

28  disclosed structure is capable of performing the recited function does not satisfy the

HOWREY LLP

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY OF RAKTL'S SELECTED CLAIMS UNDER SECTION 112

DM_US21021836.v1

requirement of clearly linking structure to the recited function.  *See Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001).

"In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."  *WMS Gaming Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1349 (Fed. Cir. 1999).  Disclosure of a general purpose computer as the structure for performing a claimed function amounts to pure functional claiming and does not satisfy § 112, ¶ 6.  *Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech.*, 2008 WL 819764 at *4 (Fed. Cir. Mar. 28, 2008)(affirming summary judgment of  invalidity).

### A.   Claims Reciting Voice Signals To Actuate The Caller's Terminal Apparatus Are Indefinite

Selected '968:7, '707:24, 69, 85, 86, 92, 115, 116, 129, 130, and 201, '863:96, 98, 99, 182, and 188-192, and '309:46 and 51 recite voice signals or a voice generator structure actuating the caller's telephone terminal.  COL 2.3.1-2.3.5.  This claim language is indefinite, because voice signals do not themselves actuate the caller's telephone; the caller does.  COL 2.3.6.

This very issue arose during prosecution of RAKTL's U.S. Patent No. 5,218,631:

Also deemed inaccurate is claim 19, lines 14-15, "generating voice signals and supplying said voice signals <u>to actuate said terminal apparatus</u>" (emphasis added), since the "terminal apparatus" (indicated to be the <u>telephone</u> of a caller) obviously is <u>not</u> in fact "actuated" by the voice signals:  rather, only the <u>caller</u> does any "actuating" of his or her telephone.

The examiner, therefore, rejected claim 19.  SUF 1.3.7.  Katz responded:

The Examiner's rejection to the specification and Claim 19 has been overcome by amending the claim and deleting the term "actuate."

Accordingly, Claim 19 now recites generating voice signals and supplying

HOWREY LLP

DM_US21021836.v1

1  said voice signals to said terminal apparatus, to provide vocal operating

2  instructions to a caller.

3  SUF 1.3.8.  Other claims of the RAKTL patents do not have this defect.  For example,

4  '551:14 recites "voice generator structure selectively coupled through the interface

5  structure to the terminals for providing vocal operating instructions to individual

6  callers."  *See also* '965:31, which recites cuing to "prompt selective actuation **by an**

7  **individual caller** of said digital input device…."  SUF 1.3.9.

8  Instead of selecting claims having accurate language, RAKTL chose to assert

9  claims having the "actuating" language considered by the examiner to be inaccurate.

10  Given this prosecution record, RAKTL cannot now argue that this claim language is

11  not indefinite.  Therefore, the claims are invalid.  COL 2.3.7.

12  **B.  Generating Computer Acknowledgement Numbers To Identify**
13  **The Transaction For "The System" In '965:31 Is Indefinite**

14  Selected '965:31 recites generating computer acknowledgement numbers to

15  identify the transaction for "the system."  COL 2.3.8.  "The system" to which the

16  transaction is identified is not defined in the claim.  COL 2.3.9.  There is no antecedent

17  basis for "the system."  COL 2.3.10.  By contrast, claim 34 similarly recites that

18  "computer generated acknowledgement numbers" are provided "to identify transactions

19  to … the system," but unlike claim 31, there is antecedent basis for "the system" in

20  claim 34, i.e., a "system operating a format" in the preamble.  SUF 1.3.13.

21  On January 31, 2002, through a request for certificate of correction, RAKTL

22  attempted to "correct" claim 31 by adding "with a system operating a format" (the

23  language in claim 34) into the preamble of the claim.  SUF 1.3.14.  The PTO did not

24  permit the correction on grounds that it changed the scope of the claim.  *Id*.

25  "The system" in the generating step of claim 31 is undefined and, based on the

26  PTO's action, "with a system operating a format" cannot be read into the preamble of

27  claim 31 to provide antecedent basis for "the system" in the generating step.

28  Accordingly, "the system" in claim 31 of the '965 patent is indefinite.  COL 2.3.10.

HOWREY LLP

**C.    Claims Reciting That Remote Terminals "May Comprise" A
Conventional Telephone Instrument Are Indefinite**

Selected '968:7, '309:42, 44, 46, and 51, '707:24, 115, 116, 129, 130, and 201,
'863:27, 31, 32, 42, 43, 49, 96, 98, and 99, and '285:1, 49, and 61 recite that remote
terminals "***may comprise*** a conventional telephone instrument."  COL 2.3.11-2.3.13.
"May comprise" does not define whether the remote terminals are a conventional
telephone instrument or not; they could be something else that is not defined in the
claims or specification.  COL 2.3.14.  This language is ambiguous to a person of skill in
the art.  COL 2.3.15.

This exact issue arose during prosecution of a number of RAKTL patent
applications.  In each case, the examiner rejected the claims reciting "may comprise" as
indefinite, and in response, the claims were amended to remove that indefinite language.
For example, in the application leading to the '893 Conditional Interface patent:

> Claim 18-20, 22-29 are rejected under 35 U.S.C. § 112, second paragraph,
> as being indefinite ….  In claim 18, line 4; claim 23, line 3; claim 27, line
> 6; claim 29, line 5, the phase "may comprise" is vague and indefinite in
> that it is not clear as to whether or not the remote terminals do comprise a
> conventional telephone instrument.

SUF 1.3.21.  The claims were then amended to remove the offending "may comprise"
language.  *Id*; *see also* SUF 1.3.20, 1.3.22 regarding the '762 and '156 patents.

RAKTL could have selected claims without this defect, but instead chose to assert
the claims at issue, which all recite the "may comprise" language that the patent
examiner held to be indefinite.  SUF 1.3.23.  Accordingly, the claims are indefinite for
failing to particularly point out and distinctly claim the invention.  COL 2.3.15.

**D.    "Certain Individual Callers," "Said Individual Callers," And "At
Least Certain Of Said Individual Callers" Render '965:35, 43,
And 53 Indefinite**

Selected '965:35, 43, and 53 recite (1) "remote terminals for use by certain

1  individual callers" in the preamble and "said certain individual callers" in the
2  interfacing step, (2) "said individual callers" in the receiving, comparing, and providing
3  steps, and (3) "at least certain of said individual callers" in the transferring step.  The
4  use of these different phrases suggests that different groups of callers were meant to be
5  encompassed by each term.  COL 2.3.16, 2.3.17.  A person of ordinary skill in the art
6  cannot determine, however, what group of callers each of these terms is intended to
7  cover, either from the claim language or the specification.  COL 2.3.19.

8      Moreover, the claim language does not make sense to a person skilled in the art.
9  For example, it makes no sense that "said individual callers" are prompted to provide
10 responsive signals, but that only "said certain individual callers" ("certain" connoting a
11 smaller group within the group of "said individual callers") have remote terminals and
12 are interfaced with the system.  COL 2.3.18.  The claims are ambiguous and not
13 amenable to construction and therefore indefinite.  COL 2.3.19.

14  **E.   Receiving Signals Indicating A Customer Identification Number
15       "Or" Receiving Responsive Signals Indicative Of Other Data
         Renders '965:61 And 66 Indefinite**

16      Selected '965:61 and 66 recite, ***alternatively***, (1) receiving responsive signals
17 including signals indicative of a customer identification number *or* (2) receiving
18 responsive signals, including signals indicative of other data.  COL 2.3.20, 2.3.21.
19 Thus, ***either*** the customer identification number *or* the other data are received, not both.

20      The claim further recites in a "testing" step that the customer identification
21 number is tested ***and*** in a "processing" step that the other data is processed.
22 COL 2.3.21.  These two steps require that ***both*** the customer identification number ***and***
23 the other data be received so that they can be tested and processed, respectively.

24      This creates an insoluble contradiction in the claim.  If only customer
25 identification number *or* other data signals are received as recited in the receiving step,
26 it is impossible to carry out both the step of testing the customer identification number
27 and the step of receiving the other data.  *Id.*  The claims are ambiguous and a person
28 skilled in the art cannot determine their scope.  Thus, they are indefinite.  COL 2.3.22.

-30-

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY OF RAKTL'S SELECTED CLAIMS UNDER SECTION 112

**F.**   **"Means To Receive" Limitations In The '863 And '065 Patent
Claims Fail To Link Structure To The Recited Function**

Selected '863:27, 31, 32, 42, 43, and 49 recite means to receive DNIS "to identify
a select one of a plurality of different called numbers associated with a select format of a
plurality of different formats."  COL 2.3.23.  Selected '065:13 recites means for
"receiving called terminal digital data (DNIS) signals automatically provided by the
telephone facility to identify the select operating format from a plurality of distinct
operating formats."  COL 2.3.24.  In *Citibank*, the parties agreed that this is a § 112, ¶ 6
limitation.  COL 2.3.25, 2.3.26.  The parties also agreed that the functions are set out in
the above-quoted claim language, in short, using DNIS to identify a select format.  *Id*.

The Format Qualification specification, however, does not describe structure
linked to this function.  In *Verizon*, this Court found that "the '065 patent is unclear as to
which component selects formats based on called-number identification signals…."
*Verizon*, 326 F. Supp. 2d at 1100.  While ultimately identifying corresponding structure,
*Verizon* did not consider indefiniteness.  Even Mr. Katz could not point to disclosure
linking structure to the function of using DNIS to select a format.  COL 2.3.27.

In *Citibank*, RAKTL argued that the structure corresponding to the receiving
means is (a) interface 20, call data analyzer 21a, and associated software; (b) Centrum
9000; or (c) one or more interface units IA1-IAn, IB1-IBn and associated software.
COL 2.3.28.  The specification, however, does not link these structures to the function
of using DNIS to select one format from a plurality of formats.  COL 2.3.29-2.3.33.

One passage relating to the Figure 1 embodiment cited by RAKTL in *Citibank*
only states that the automatic call distributor "associates the called number … through
the interface 20 and switch 21," not that one of RAKTL's structures identifies a format.
COL 2.3.29.  RAKTL's reliance in *Citibank* on '863 patent, col. 10, ll. 28-41 is
misplaced because this passage merely describes a coupling through the automatic call
distributor AC1, the interface 20 and the switch 21 to a processor PR1 (Figure 1).  COL
2.3.30-2.3.32.  It does not identify a structure that uses DNIS to identify a select format.

1  *Id.* Further, the specification does not describe interface units IA1-IAn in the Figure 9

2  embodiment as performing this function.  *Id.*

3      Because there is no structure clearly linked to the function in the "receiving

4  means" of '863:27, 31, 32, 42, 43, and 49 or to the function in the "means for receiving"

5  of '065:13, these claims are indefinite.  *Atmel*, 198 F.3d at 1380.  COL 2.3.34.

6      **G.    "Said Additional Call Data Signals …" In '285:23 Is Indefinite**

7      Selected '285:23 depends from claim 22, which recites "providing signal-

8  represented call data from said remote terminals including calling numbers as ***additional***

9  ***call data signals***."  COL 2.3.35.  Claim 23 recites "providing ***said additional call data***

10  ***signals*** automatically from said telephone communication system (e.g. ANI)," referring

11  back to "additional call data signals" in claim 22.  *Id.*  This means that the ANI signals

12  in claim 23 are provided from the remote terminals (recited in claim 22).  COL 2.3.36.

13      This is contradictory to a person skilled in the art.  Specifically, the additional call

14  data signals in claim 22 are provided "from said remote terminals," that is, from the

15  caller's telephone, depicted as T1 in Figure 1 of the patent.  Such call data signals would

16  be input by the caller using the telephone's touch tone buttons.  *Id.*  But to those skilled

17  in the art, ANI is only provided by the communication facility, not by the remote

18  terminals as required by claim 23 (which defines ANI as "said additional call data

19  signals," referring back to "additional call data signals" in claim 22).  *Id.*

20      Because there is an irreconcilable conflict between the additional call data signals

21  from the remote terminals in claim 22 and the ANI additional call data signals in

22  claim 23, '285:23 is indefinite.  COL 2.3.37.

23      **H.    System Claims Reciting A Method Step Of Callers Entering Data
         In The '707 And '893 Patents Are Indefinite**

24

25      Selected '707:116 is directed to "a system" but recites a method step, "wherein

26  said individual callers provide caller credit card number data as said other data."  COL

27  2.3.38.  Selected '893:1, 2, 4, and 83 are directed to "an interface control system" but

28  recite a method step, "wherein said certain of said individual callers digitally enter

HOWREY LLP

-32-

DM_US21021836.v1

1  data." COL 2.3.39.  Claims mixing system and method limitations are indefinite.

2       In *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1383-84 (Fed. Cir.

3  2005), the claim was directed to "a system" but recited "wherein … the user uses the

4  input means…."  Because the claim recited a system, on the one hand, and a method of

5  using the system on the other hand, the court concluded that it was unclear what acts

6  constituted infringement and held the claim indefinite.  COL 2.3.40.

7       Just like the claim at issue in *IPXL Holdings*, '707:116 and '893:1, 2, 4, and 83

8  are directed to a system but recite a method of using the system.  Therefore, they are

9  indefinite because what acts constitute infringement cannot be determined.  COL 2.3.41.

10  **I.    "Processing/Computer Means" And "Means For Processing" In**
11  **       The Format Qualification Patents Are Indefinite For Failure To**
12  **       Link Structure Including Algorithm To The Recited Functions**

13       Selected '065:13 and '551:21, 33, and 34 recite "processing means" that perform

14  four functions:  (1) receiving customer number data entered by a caller; (2) storing the

15  customer number data in a memory or central memory; (3) coupling an incoming call to

16  the operator terminal; and (4) visually displaying the customer number data.  Similarly,

17  selected '551:1 recites "computer means" that performs three functions: (1) connecting

18  an incoming call to the operator terminal; (2) accessing customer data corresponding to

19  caller telephone number data stored in memory; and (3) visually displaying customer

20  data.  COL 2.3.42.  "Processing means" and "computer means" should be construed as §

21  112, ¶ 6 limitations.  *See, e.g.*, *Cross Med. Prods., Inc. v. Medtronic Sofamore Danek,*

22  *Inc.*, 424 F.3d 1293, 1307 (Fed. Cir. 2005) ("means" creates a presumption that § 112,

23  ¶ 6 applies).  COL 2.3.43.

24       The specification discloses that only processors PR1-PRn (*see* Fig. 1), specifically

25  processing unit 92 (*see* Fig. 4) of the processors, receives and stores customer number

26  data in a memory and couples an incoming call to an interface terminal.  SUF 1.3.51.

27  Accordingly, the processing unit 92 must be part of the corresponding structure for

28  processing and computer means.  The specification discloses that processors PR1-PRn

HOWREY LLP

DM_US21021836.v1

1  "may comprise a microcomputer, for example, programmed as suggested above and as

2  disclosed in detail below to accomplish specific operating formats." *Id*. The

3  specification further discloses that processing unit 92 "may take the form of a mini-

4  computer programmed to accommodate the functions of various applications . . . ." *Id*.

5  However, the specification does not clearly link or associate any algorithm for

6  processors PR1-PRn, or more specifically processing unit 92, to perform the recited

7  functions.  COL 2.3.46.  Furthermore, as discussed in Section II.M above, the

8  specification does not disclose visually displaying customer number data.

9          RAKTL's prosecuting agent (Kuyper) testified that algorithms are unnecessary

10 because they are "known to one of ordinary skill in the art."  SUF 1.3.52.  But "[a]

11 patent holder cannot evade [the corresponding structure] requirement with a conclusory

12 assertion that one skilled in the art would understand the claimed means despite the

13 failure to disclose a structure."  *Atmel*, 198 F.3d at 1378; *see also Aristocrat Techs*.,

14 2008 WL 819764 at *7 (an argument that a skilled person could build the claimed

15 device without a disclosed algorithm improperly conflates the enablement requirement

16 and the requirement to disclose corresponding structure under § 112, ¶ 6).  COL 2.3.48.

17 In fact, Ms. Kuyper testified that none of the RAKTL patents contain an algorithm.

18 SUF 1.3.52.  Thus, '065:13 and '551:1, 21, 33, and 34 are indefinite.  COL 2.3.49.

19         Selected '707:115, 116, 129, and 130 recite "means for processing at least certain

20 of said data developed by said terminals and said calling number identification data…."

21 COL 2.3.50.  The parties agree that this is a § 112, ¶ 6 limitation and that unit 92 ("a

22 mini-computer programmed to accommodate the functions of various applications . . .")

23 is part of the corresponding structure (although the parties disagree about what other

24 structures should be included).  (D.I. 735-2, Parties' Pre-Briefing Proposed and Agreed

25 Claim Constructions at 7).  COL 2.3.51.  Similarly, selected '863:96, 98, and 99 recite

26 "means for processing at least certain of said answer data signals…."  COL 2.3.52.  This

27 "means for processing" limitation should also be treated under § 112, ¶ 6.  COL 2.3.53.

28 For the reasons discussed above with respect to the '065 and '551 patents, the

HOWREY LLP

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY OF RAKTL'S SELECTED CLAIMS UNDER SECTION 112

DM_US21021836.v1

1  specification fails to link any algorithm for performing the recited functions, and the

2  '707 and '863 patent claims are likewise indefinite.  COL 2.3.54, 2.3.55.

3      **J.    "Analysis Structure" In Claims Of The Format Qualification
              Patents Is Indefinite For Failure To Link Structure Including
4             Algorithm To The Recited Functions**

5

6       Selected '021:11, '309:42, '551:19, and '547:11, 18, and 19 recite an "analysis

7  structure."  COL 2.3.56.  The Court has ruled that "analysis structure" is a § 112, ¶ 6

8  limitation, that the function is processing data, and that part of the corresponding

9  structure is processing unit 92.  COL 2.3.57.  The Court reserved ruling on whether

10 claim 42 was indefinite for no disclosure of an algorithm for processing unit 92 to

11 perform the recited function.  *Id.*

12      As discussed in Section III.I above, the Format Qualification specification

13 discloses that processing unit 92 "may take the form of a mini-computer programmed to

14 accommodate the functions of various applications . . . ."  SUF 1.3.59.  But the

15 specification does not ***clearly link or associate*** any algorithms for processing unit 92 to

16 perform the recited function (i.e., "processing said caller data signals" or "processing at

17 least certain of the data relating to certain individual callers").  COL 2.3.60.  The

18 specification discloses a variety of operations that processing unit 92 may perform (*see,*

19 *e.g.*, '065 patent, col. 3, ll. 23-43, col. 9, ll. 52-54), but does not clearly link any of the

20 numerous aspects of the processing unit 92, or any algorithm to the recited function.

21 COL 2.3.61.  Accordingly, the claims are indefinite.  COL 2.3.62.

22 **IV.   CONCLUSION**

23      In view of the law and facts discussed herein, the accompanying uncontroverted

24 facts and conclusions of law and declarations, summary judgment should be entered that

25 the above-identified claims are invalid under 35 U.S.C. § 112.

26

27 Date:  April 3, 2008              By:  _____/s/ Matthew J. Moore_____

28                                        Matthew J. Moore
                                          Liaison Counsel for Defendants

**HOWREY LLP**

DM_US21021836.v1